BASIN ELECTRIC POWER COOPERA-
TIVE, INC., as operating agent for the
Participant–Owners of the Missouri Ba-
sin Power Project, Petitioner (Plaintiff),

v.

DEPARTMENT OF REVENUE, STATE
OF WYOMING; Board of County Com-
missioners for Platte County; Platte
County Clerk, Respondents (Defen-
dants).

The Board of County Commissioners for
Platte County, Wyoming, Cross–
Petitioner (Defendant),

v.

Basin Electric Power Cooperative, Inc., as
operating agent for the Participant–
Owners of the Missouri Basin Power
Project; and the Wyoming Board of
Equalization, Cross–Respondents
(Plaintiffs).

Nos. 97–3, 97–4.

Supreme Court of Wyoming.

Dec. 16, 1998.

Rehearing Denied Jan. 12, 1999.

Richard G. Smith and Eugene A. Ritti of Hawley Troxell Ennis & Hawley LLP, Boise, Idaho; W. Perry Dray and Brandin Hay of Dray, Thomson & Dyekman, P.C., Cheyenne, Wyoming; and James W. Gusea of Gusea, Pattno and White, Cheyenne, Wyoming, Representing Basin Electric Power Cooperative. Argument by Mr. Smith.

William U. Hill, Attorney General; Michael D. Basom, Assistant Attorney General, Representing State of Wyoming Department of Revenue. Argument by Mr. Basom.

David F. Palmerlee of Omohundro, Palmerlee and Durrant, Buffalo, Wyoming; and Bruce A. Hellbaum of Jones, Jones, Vines & Hunkins, Wheatland, Wyoming, Representing Board of County Commissioners of Platte County, Wyoming. Argument by Mr. Palmerlee.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and TAYLOR,* JJ.

GOLDEN, Justice.

This case involves a petition and a cross-petition for review filed with the district court and subsequently certified to this Court pursuant to Rule 12.09 of the Wyoming Rules of Appellate Procedure. In Case No. 97–3 Basin Electric Power Cooperative (Basin) seeks review of that portion of the Wyoming State Board of Equalization's (Board) Findings of Fact, Conclusions of Law and Order (Decision), which affirmed the Department of Revenue's (Department) valuation of Basin's Wyoming property for ad valorem tax purposes. In Case No. 97–4 the Board of County Commissioners for Platte County (Platte County) appeals from the Board's reversal of the Department's determination that tax benefit transfers are part of the property's taxable value for ad valorem tax purposes.

Before 1994, the Department's valuation methods for Basin and other non-profit rural electric cooperatives (RECs) were similar to the valuation methods used for investor-owned utilities (IOUs). In 1994, the Board required the Department to change its valuation methods for the RECs. However, neither the Department nor the Board provided a reasonable basis in the record for valuing non-profit RECs and IOUs differently. Therefore, the Department's valuation of Basin's property was not based on uniform taxation principles, in violation of Article 15, Section 11 of the Wyoming Constitution.[1] Additionally, the valuation, and the methodology used to obtain it, were not supported by substantial evidence or by statutory or regulatory authority. Therefore, we reverse that portion of the Board's Decision from which Basin appeals in Case No. 97–3.

In Case No. 97–4, Platte County petitions for review of the tax benefit transfer issue.

* Chief Justice at time of oral argument; retired November 2, 1998.

1. Article 15, Section 11 of the Wyoming Constitution provides:

(a) All property, except as in this constitution otherwise provided, shall be uniformly valued at its full value as defined by the legislature, in three (3) classes as follows:
(i) Gross production of minerals and mine products in lieu of taxes on the land where produced;
(ii) Property used for industrial purposes as defined by the legislature; and
(iii) All other property, real and personal.
(b) The legislature shall prescribe the percentage of value which shall be assessed within each designated class. All taxable property shall be valued at its full value as defined by the legislature except agricultural and grazing lands which shall be valued according to the capability of the land to produce agricultural products under normal conditions. The percentage of value prescribed for industrial property shall not be more than forty percent (40%) higher nor more than four (4) percentage points more than the percentage prescribed for property other than minerals.
(c) The legislature shall not create new classes or subclasses or authorize any property to be assessed at a rate other than the rates set for authorized classes.
(d) All taxation shall be equal and uniform within each class of property. The legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal.

However, pursuant to WYO. STAT. 39–1–306 (1990) and the Wyoming Administrative Procedure Act, Platte County is without standing to wage an attack on the Board's Decision. In the absence of jurisdiction to review the Board's Decision on the basis of Platte County's petition for review, we dismiss the same.

## ISSUES

Petitioner Basin presents the following issues in its petition for review in Case No. 97–3:

I. Did the State Board err in failing to conclude that the 1994 assessment of Basin Electric's operating property violates Article 15, Section 11 of the Wyoming Constitution?

II. Did the State Board err in affirming the Department's 1994 assessment of Basin Electric's operating property?

III. Did the State Board err in granting Platte County's motion to intervene as a party to this proceeding?

Respondent Platte County contends the principal issue is:

[W]hether the Wyoming State Board of Equalization ("Board") correctly concluded in its Final Decision that the Department of Revenue ("Department") properly imputed and capitalized a for-profit income to capture the return on equity which Basin Electric Power Cooperative, Inc.'s ("Basin") members receive in the noncash form of lower cost of electric service, which resulted in the Department's 1994 appraised value of Basin of $2,083,000,000.

In its brief, Respondent Department submits the following issues:

1. Whether substantial evidence exists to support the Board of Equalization's action ("Board") upholding the Department's 1994 valuation of Basin Electric's operating property within the State of Wyoming?

2. Whether the Department's valuation of Basin Electric's electric operating property within the State of Wyoming for 1994 represents fair market value?

3. Whether the Board properly determined that the Department's valuation of Basin Electric for 1994 did not violate Article 15, Section 11, of the Wyoming Constitution?

In Case No. 97–4, Petitioner Platte County seeks review of that portion of the Findings of Fact, Conclusions of Law and Order of the Wyoming State Board of Equalization ("State Board") dated the 28th day of June, 1996 ("State Board Decision") relating to the subject of tax benefit transfers.

Respondent Basin presents an additional issue for review, concerning whether this Court has jurisdiction to hear Case No. 97–4, because the County allegedly failed to timely file its cross-petition for review. The Department, satisfied with the Board's Decision, did not petition for review of the tax benefit transfer issue.

## FACTS

Before 1961, rural electric cooperatives in the Great Plains region depended on power generated by hydroelectric facilities in the Missouri River Basin. The facilities were owned and operated by the Federal Bureau of Reclamation, which in turn sold power to its "preference customers," defined as "the rural electric customers and municipals in the region." However, by 1959, the hydroelectric facilities in the Missouri River Basin could not provide enough power to satisfy the increasing demand for electricity from the preference customers. The Bureau of Reclamation warned its preference customers that they needed to commence building, buying or acquiring additional power resources for their projected power requirements.

As a result, rather than continuing to depend upon federal power or investor-owned utilities (IOUs), several generation and transmission cooperatives and distribution cooperatives banded together to supplement their power resources and to provide alternative sources of power. Basin was formed in 1961 to provide an alternative source of power generation to its member cooperatives. Basin is currently owned by eight generation and transmission cooperatives which, together with a group of distribution cooperatives, comprise Basin's Class A membership. The eight generation and transmission coopera-

tives are, in turn, owned by over one hundred distribution cooperatives, which provide electricity to ultimate consumers.

Basin operates four major generating facilities, including its 42.27% interest in Laramie River Station, located in Platte County, Wyoming. The other owners of the Laramie River Station are Tri–State Generation and Transmission Association, Lincoln Electric System, Heartland Consumers Power District, Western Minnesota Municipal Power Agency, and Wyoming Municipal Power Agency.

*Procedural background*

Valuation of electric utilities for ad valorem tax purposes is governed by Wyo. Stat. § 39–2–201(a)(iii) (Cum. Supp 1993). Pursuant to the statutes in effect in 1994,[2] the Department was to value and assess the property of electric utilities at fair market value for annual taxation purposes. "Fair market value" is

> the amount in cash, or terms reasonably equivalent to cash, a well informed buyer is justified in paying for a property and a well informed seller is justified in accepting, assuming neither party to the transaction is acting under undue compulsion, and assuming the property has been offered in the open market for a reasonable time. . . .

Wyo. Stat. § 39–1–101(a)(vi) (Cum.Supp. 1993). The statutes in effect at the time of the 1994 assessment directed the Board to perform the duties specified in Article 15, Section 10 of the Wyoming Constitution,[3] to review Department assessments of property and tax determinations, and to hear appeals from any person aggrieved by any final administrative decision of the Department.

Wyo. Stat. §§ 39–1–304(a) and 302 (Cum. Supp.1993). The Board also possessed the authority to prescribe, by rule and regulation, the appraisal methods and systems for determining fair market value, but only after recommendation from the director of the Department. Wyo. Stat. § 39–2–102 (Cum. Supp.1993).

In 1991, Platte County appealed from the Department's valuation of the six non-profit owners of the Laramie River Station and later filed another appeal challenging the appraisals for the years 1988 through 1993. Both appeals were settled in early October 1993. On October 11, 1993, the Board entered an Order Initiating Review, "[p]ursuant to Article 15, Section 10, [of the] Wyoming Constitution, W.S. 39–1–304(a)(xiii), and W.S. § 39–1–304(a)(xx)." The order directed the Department to:

> report in writing to the Board all information relating to the assessment of property of all Wyoming rural electric cooperative utilities as will be necessary and desirable to afford the Board a reasonable opportunity to review the state assessment practices, methodology, formulas or systems, and to determine whether such practices, methodologies, formulas or systems comprise a fair and reasonable approach for uniformly establishing fair market value of such property as required by law.

After hearings in a non-contested format, the Board issued its Investigative Report (Report), dated May 3, 1994, which discussed the Department's appraisal methodology, using Basin as a case study. The Report announced that the Department's pre–1994 valuations of Basin were erroneous because the highest and best use of the property is as an

---

**2.** The Department was created in 1990 as part of the Wyoming Government Reorganization Act of 1989, Wyo. Stat. §§ 9–2–1701 through –1708 (1997). Thereafter, the Board and the Department were two separate entities with separate duties and responsibilities. *See* Wyo. Stat. §§ 39–1–301 (Cum.Supp.1993) and 9–2–2007 (1997). The Board and the Department were reorganized in 1995. 1995 Wyo. Sess. Laws Ch. 209, p. 461. The valuation for the 1994 tax year is at issue here. Therefore, significant portions of the statutory provisions and agency rules relevant to this controversy have been changed, requiring use of the 1990 Replacement Volume, the 1993 Cumu-

lative Supplement to Title 39 of the Wyoming Statutes and the August 12, 1993, version of the Board of Equalization Rules and Regulations (Rules). Additionally, in 1998, the legislature recodified the tax statutes, which are now found in Chapters 11 through 19 of Title 39.

**3.** Article 15, Section 10 of our constitution provides:

> The duties of the state board shall be to equalize the valuation on all property in the several counties and such other duties as may be prescribed by law.

investor-owned utility, rather than a non-profit entity.

In accordance with the directives from the Board's Report, the Department changed its appraisal methods for Basin and assumed the typical buyer, for fair market value appraisal purposes, would be an investor-owned utility. Believing the methods established in the Board's Report were mandatory, the Department identified and used the Board's alternative methods to value Basin. The Department's 1994 appraisal of Basin, using the appraisal methods from the Board's Report, was issued shortly after the Report was issued. The change in valuation methods produced a change in Basin's system value from $1.22 billion in 1993 to $2.08 billion in 1994.

Pursuant to Wyo. Stat. § 39-1-302(c) (Cum.Supp.1993), Basin appealed from the Department's 1994 valuation of its Wyoming property to the Board, primarily arguing that the valuation was disproportionate to other Wyoming electric utilities and that the valuation violated the "uniformly valued" and "equal and uniform" provisions of the Wyoming Constitution. The Board allowed Platte County to intervene in the appeal because a substantial portion of Basin's assets are located in Platte County, constituting a significant percentage of the County's tax base.

The Board upheld the Department's use of the appraisal techniques presented in the Board's Report, but held that the Department erred in determining that tax benefit transfers should be included as part of Basin's property value. The Board ordered the Department to recalculate Basin's cost approach indicator and to consider the loss in value to Basin's property resulting from tax benefit transfers. Basin and Platte County petition for review those portions of the Decision which adversely affect them.

## DISCUSSION

Before undertaking the substantive analysis of the issues presented for review, we must address two preliminary matters. The first matter concerns whether Platte County has standing to petition for review in Case No. 97-4. The second issue concerns the authority of the Board to hold an "investigatory hearing" and require the Department to comply with an "Investigative Report."

*Case No. 97-4*

■ The Department acquiesced in the Board's Decision, including those issues presented by Case No. 97-4, leaving Platte County as the sole petitioner. At no stage in the proceedings did any party raise the question of whether or not, under the statutes of this state, or by any other authority, Platte County had a right to appeal the Board's Decision to the district court or to this Court. Ordinarily this Court refrains from inquiring into questions not raised by the parties; however, because the right of appeal is statutory and jurisdictional, we have a duty to determine that the appeal has been properly taken so as to invoke our jurisdiction. *Pritchard v. State Div. of Voc. Rehab., Dept. of Health and Social Svs.*, 540 P.2d 523, 524 (Wyo.1975).

> The right of judicial review of an administrative decision is statutory. Actions of an administrative agent are not reviewable unless made so by statute. Legislative intent to restrict judicial review of an administrative action must be clear and persuasive reason must exist to believe that restriction was the legislative purpose.

*Holding's Little America v. Bd. of County Comm'rs of Laramie County*, 670 P.2d 699, 702 (Wyo.1983).

Wyo. Stat. § 39-1-306 grants the right to appeal from a decision of the State Board of Equalization. It provides:

> Any person[,] including the state of Wyoming[,] aggrieved by any order issued by the board, or any county board of equalization whose decision has been reversed or modified by the state board of equalization, may appeal the decision of the board to the district court of the county in which the property or some part thereof is situated.

Wyo. Stat. § 39-1-306 (1990).

■ The task before us is to determine whether a board of county commissioners is a "person," with the right to appeal the Board's Decision. In the statutes pertaining

to taxation and revenue, "person" is defined as

an individual, partnership, corporation, company or any other type of association and any agent or officer of any partnership, corporation, company or other type of association.

WYO. STAT. § 39–1–101(a)(xiii) (Cum.Supp. 1993). The board of county commissioners sought review of the Board's Decision in its official capacity. The board of county commissioners is not included in the plain language of the definition of "person," and the plain language of WYO. STAT. § 39–1–306 (1990) does not otherwise provide a board of county commissioners with a right of appeal from the Board's Decision.

▮ In fact, the right of appeal from an adverse ruling is specifically denied to an "agency" by the Wyoming Administrative Procedure Act (WAPA). *See* WYO. STAT. §§ 16–3–114(a) (1997) and 16–3–101(b)(vii) and (i) (Cum.Supp.1993). The WAPA provides, in part:

any person aggrieved or adversely affected in fact by a final decision of an agency in a contested case, or by other agency action or inaction, or any person affected in fact by a rule adopted by an agency, is entitled to judicial review. . . .

WYO. STAT. § 16–3–114(a) (1997).

The WAPA defines a "person" as

any individual, partnership, corporation, association, municipality, governmental subdivision or public or private organization of any character *other than an agency.*

WYO. STAT. § 16–3–101(b)(vii) (Cum.Supp. 1993) (emphasis added). The definition assigned the term "person" specifically excludes agencies. An "agency" is defined as

any authority, bureau, **board,** commission, department, division, officer or employee of the state, a county, city or town or other political subdivision of the state, except the governing body of a city or town, the state legislature and the judiciary.

WYO. STAT. § 16–3–101(b)(i) (Cum.Supp.1993) (emphasis added). The board of county commissioners is a "board" pursuant to the Wyoming Administrative Procedure Act and falls within the definition of an "agency" which is specifically precluded from seeking review of an administrative decision. *See Holding's Little America,* 670 P.2d at 701–02 (board of county commissioners is an agency as defined by the Wyoming Administrative Procedure Act).

Absent statutory authority granting the board of county commissioners the right to seek review of a Wyoming State Board of Equalization decision, we hold that the board of county commissioners lacks standing. We must dismiss the appeal because we are without jurisdiction to hear it. *Brandt v. TCI Cablevision of Wyoming,* 873 P.2d 595, 598 (Wyo.1994). Case No. 97–4 is dismissed.

However, Case No. 97–3 does not present the same jurisdictional dilemma. Basin is an appropriate party to petition for review, the Department is the respondent and Platte County is not attempting an independent appeal. Therefore, we will address Case No. 97–3 on the merits.

### The 1994 Investigative Report

We find the following in the Board's Decision:

In June, 1991, Platte County initiated its appeal of the Department valuation of the six non-profit owners of the Laramie River Station near Wheatland, Wyoming. A separate appeal was subsequently filed challenging appraisal years 1988 through 1993. Both appeals were settled in early October, 1993. On October 11, 1993, this Board entered its "Order Initiating Review," Docket No. 93–159, [footnote omitted] to consider Department assessment practices and methodology for all Wyoming rural electric cooperative utilities to determine whether such practices comprised a fair and reasonable approach for establishing the fair market value of such utilities. After hearings in a non-contested format, the Board issued an Investigative Report dated May 3, 1994 discussing the Department appraisal methodology, using Basin as a case study. The Department 1994 Basin appraisal was issued shortly after the Board Investigative Report.

The Board's 1994 Report ("Report") determined that the Department's previous valuations of Basin were in error because the highest and best use of Basin's property was not as a non-profit, Basin-type property. Instead, the Board determined that the highest and best use of the property was as an investor-owned utility (IOU).

■ The fundamental flaw in the Board's action is that it failed to acknowledge that its authority is limited to the adjudication of taxation issues and rulemaking. The Board lacks authority to hold a "fact finding proceeding" which is neither a contested case, nor a proceeding authorized by the Wyoming Administrative Procedure Act. With the Wyoming Government Reorganization Act, the legislature created two separate entities with separate duties and responsibilities. *See* WYO. STAT. §§ 39–1–301 (Cum.Supp.1993) and 9–2–2007 (1997). The Board simply does not have authority to hold an investigative hearing or to submit an "Investigative Report" to the Department concerning the Department's appraisal methods without the Department director's recommendation. *See* WYO. STAT. § 39–2–102 (Cum.Supp.1993). There is no evidence in the record that the Department's director made any such recommendation.

■ Even if the Department recommended that the Board investigate the Department's appraisal methods and systems for determining fair market value pursuant to WYO. STAT. § 39–2–102, the Board is required to prescribe, **by rule and regulation,** appraisal methods for determining fair market value. WYO. STAT. § 39–2–102 (Cum. Supp.1993). The Board must follow the procedures found in the WAPA when it prescribes rules and regulations. WYO. STAT. § 16–3–103 (Cum.Supp.1993). The Board did not follow the WAPA requirements when it held its "Investigative Hearing" and issued its "Investigative Report." In fact, the Board's use of the Report circumvented the requirements of the WAPA and the directives from the legislature concerning the separation of the duties of the Board and the Department. Therefore, because the Report was not properly adopted, it was not valid, and the Department was not required to adhere to its mandates. WYO. STAT. § 16–3–103(c) (Cum.Supp.1993).

■ WYO. STAT. § 16–3–111 (1997) provides, in pertinent part:

No officer, employee, contract consultant, federal employee or agent who has participated in the investigation, preparation, presentation or prosecution of a contested case shall be in that or a factually related case participate or advise in the decision, recommended decision or agency review of the decision. . . .

The Board's promulgation of the Investigative Report and the subsequent reliance on that report in the contested case hearing smacks of bias and prejudice sufficient to implicate due process concerns. *See Fallon v. State Bd. of Medical Examiners,* 441 P.2d 322, 327 (Wyo.1968); *Devous v. State Bd. of Medical Examiners,* 845 P.2d 408, 417–18 (Wyo.1993). This is especially so when, as here, the legislature is clear in its mandate that the Board and the Department have separate and distinct duties. The Board has authority to hear contested cases and to promulgate rules and regulations pursuant to the WAPA. Any other exercise of authority violates the clear intent of the legislature.

The Department believed the Report "required the Department to identify and use an alternative method to value Basin in consideration of the flaws in the valuation method applied to participants of the Laramie River Station before 1994," and the Department applied the methods found in the Investigative Report as if the Report had the force and effect of law. A reviewing court must reverse actions taken by an administrative agency which exceed the agency's statutory authority. WYO. STAT. § 16–3–114(c)(ii)(C) (1997). The actions taken by the Department in accordance with what it deemed to be a mandate from the Board to change its appraisal methods in accordance with the Report are null and void. *See State Bd. of Equalization v. Jackson Hole Ski Corp.,* 737 P.2d 350, 356 (Wyo.1987), *modified,* 745 P.2d 58 (1987).

The important substantive issues arising from the use of the Report are likely to present themselves again. Therefore, we

will evaluate the validity of the Report's assumptions, including whether the separate classification of the non-profit RECs is constitutional. Accordingly, we turn now to consideration of the substantive issues in this valuation controversy.

*Standard of Review*

WYO. STAT. § 16–3–114(c) (1997) delineates the scope of appellate review for agency decisions:

> To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> (i) Compel agency action unlawfully withheld or unreasonably delayed; and
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>
> (B) Contrary to constitutional right, power, privilege or immunity;
>
> (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
>
> (D) Without observance of procedure required by law; or
>
> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Borrowing from the federal Third Circuit, we have articulated the difference between findings of basic fact and ultimate facts as follows:

> *Basic facts* are the historical and narrative events elicited from the evidence presented at trial, admitted by stipulation, or not denied, where required, in responsive pleadings. Inferred factual conclusions are drawn from basic facts and are permitted only when, and to the extent that, logic and human experience indicate a probability that certain consequences can and do follow from the basic facts. * * * No legal precept is implicated in drawing permissible factual inferences. But an *inferred fact* must be distinguished from a concept described in a term of art as an *'ultimate fact.'* So conceived, an ultimate fact is a mixture of fact and legal precept[.]

*Union Pacific R.R. Co. v. Bd. of Equalization*, 802 P.2d 856, 860 (Wyo.1990) (quoting *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3rd Cir.1981) (emphasis in *Union Pacific*)).

When faced with contested issues of fact, we examine the entire record to determine if the agency's findings are supported by substantial evidence. *Laramie County Bd. of Equalization v. State Bd. of Equalization*, 915 P.2d 1184, 1189 (Wyo. 1996). If so, we do not substitute our judgment for that of the agency and must uphold the factual findings on appeal. *Id.* Substantial evidence is more than a scintilla of evidence; it is relevant evidence which a reasonable mind might accept in support of the conclusions of the agency. *Id.*

If a conclusion of law is in accord with the law, it is affirmed. *Union Pacific*, 802 P.2d at 860 (quoting *Employment Security Comm'n v. Western Gas Processors, Ltd.*, 786 P.2d 866, 871 (Wyo.1990)). We consider three distinct possibilities when reviewing agency determinations of questions of law. *Id.* If the agency has correctly applied its findings of fact to the correct rule of law, the agency's conclusions are affirmed. *Id.* However, if the agency applied its findings of fact to the wrong rule of law or if the agency incorrectly applied its findings of fact to the correct rule of law, we must correct the error and reverse. *Id.*

When an agency's determinations contain elements of law and fact, we do not treat them with the deference we reserve for findings of basic fact. *Id.* When reviewing an "ultimate fact," we separate the factual and legal aspects of the finding to determine whether the correct rule of law has been properly applied to the facts. *Id.* We do not defer to the agency's ultimate factual finding

if there is an error in either stating or applying the law. *Id.* at 861.

■■■■ "In examining the propriety of the valuation method, 'our task is not to determine which of various appraisal methods is best or most accurately estimates [fair market value]; rather, it is to determine whether substantial evidence exists to support usage of the [chosen] method of appraisal.'" *Amoco Prod. Co. v. State Bd. of Equalization,* 899 P.2d 855, 858 (Wyo.1995) (quoting *Holly Sugar Corp. v. State Bd. of Equalization,* 839 P.2d 959, 963 (Wyo.1992)). However, the disagreement between the parties here does not concern the Department's choice of appraisal methods.[4] The controversy concerns the proper application of those methods to the facts, which is an issue of ultimate fact, requiring *de novo* review. Additionally, the Board's decision to treat Basin differently from investor-owned utilities, creating a separate classification for non-profit entities, presents a constitutional issue which is also subject to *de novo* review.

*The Valuation Decision*

The Decision discusses Basin's burden of proof and burden of persuasion in the hearing before the Board as follows (footnotes omitted):

72. An assessor's valuation for local-assessed property, and the Department valuation established for state-assessed property, are presumed valid, accurate, and correct, a presumption which survives until overturned by credible evidence. In the absence of evidence to the contrary, it is presumed the official charged with establishing value, be it a county assessor or a Department appraiser, exercises honest judgment in accordance with the applicable statutes, rules, regulations, and other directives which have passed public scrutiny, either through legislative enactment or agency rulemaking, or both. *Chicago Burlington & Quincy Railroad Co. v. Bruch,* 400 P.2d 494, 499 (Wyo.1965). If, however,

a valuation is determined without benefit of rules, regulations or clear statutory authority, the appraiser/assessor cannot and should not benefit from the validity presumption. *In the Matter of Appeal of Wisconsin Electric Company (1992 private rail car assessment),* State Board Docket No. 92–176, June 17, 1993.

73. In this appeal, the applicable constitutional provisions, statutes, and rules ... provide the required foundation for recognizing the validity presumption in favor of the Department value. Basin therefore, in challenging this value, has the initial burden to present sufficient credible evidence to overcome the presumption; and a mere difference of opinion as to value is not sufficient. *Teton Valley Ranch v. State Board of Equalization,* 735 P.2d 107 (Wyo.1987); *J. Ray McDermott & Co. v. Hudson,* 370 P.2d 364, 370 (Wyo. 1962) and *Chicago Burlington & Quincy Railroad Co. v. Bruch,* 400 P.2d 494, 499 (Wyo.1965).

74. ... In this matter however, the evidence presented by Basin through its exhibits as well as testimony of its own and other witnesses, clearly indicates more than a mere difference of opinion, and constitutes sufficient credible evidence to overcome the validity presumption in favor of the Department. The Board is thus required to equally weigh the evidence of all parties measured against the appropriate burden of proof.

75. ... The burden of going forward then shifts to the Department to defend its 1994 value, which burden was fulfilled through the evidentiary presentation of the Department and Platte County. Basin, however, having challenged the valuation, shoulders the ultimate burden of persuasion to prove by a preponderance of evidence the Department value was not derived in compliance with the required constitutional and statutory methodology standard for valuing a state-assessed property.

---

4. The Board's Rules allow the Department to use the following types of appraisal methods: 1) market approaches to value—which include the sales comparison approach and the stock and debt approach; 2) cost approaches to value— which include the replacement cost, reproduction cost and historical cost approaches; and 3) income capitalization to value approach. RULES, Ch. XXXIII, § 6.

* * *

77. Most, if not all, challenges to property valuation for ad valorem tax assessment are rooted in the Wyoming Constitution, Article 15, Section 11, which provides in relevant part:

(a) All property, except as in this Constitution otherwise provided, shall be uniformly valued at its full value as defined by the Legislature, in three (3) classes as follows: . . . .

(d) All taxation shall be equal and uniform within each class of property.

The Wyoming Supreme Court, in at least eleven decisions, has consistently interpreted this constitutional requirement to mandate "only a rational method [of appraisal], equally applied to all property, which results in essential fairness." *Holly Sugar v. State Board of Equalization*, 839 P.2d 959, 962 (Wyo.1992) quoting *Teton Valley Ranch v. State Board of Equalization*, 735 P.2d 107, 115 (Wyo.1987). Broken into its components, this standard requires: 1) a rational method; 2) equally applied to all property; and 3) essential fairness. It is thus the burden of Basin as the party challenging the Department valuation to prove by a preponderance of evidence at least one of the elements of the standard has not been fulfilled.

The various experts applied approved methodologies differently, resulting in a significant discrepancy in the fair market value of Basin's Wyoming property. Platte County's appraiser, Mr. Goodwin, found a system value of $2,200,000,000; Mr. Uhrich, from the Department of Revenue, found a system value of $2,083,000,000; and Basin's appraisal expert, Mr. Schoenwald, found a system value of $1,434,162,000.[5]

As a result of the Investigative Report, the Department applied approved appraisal methods incorrectly. We find that the Board's Decision is erroneous in its conclusions regarding: 1) the highest and best use of Basin's property; 2) the all-requirements contracts; 3) imputed income; 4) the capitali-

zation rates; and 5) the separate classification of non-profit utilities. Those conclusions resulted in an increase of almost one billion dollars to Basin's system valuation. As we will discuss below, those conclusions have no basis in the law, and we find no authority for them in the applicable statutes, the Board's Rules, or the factual findings made by the Board in its Decision.

*Highest and Best Use*

 Before the Board's May 3, 1994 Investigative Report, *In the Matter of the Review of the Property of Wyoming Rural Electric Cooperative Utilities*, the Department's valuation considered the highest and best use of Basin's assets was to continue as a non-profit generation and transmission property. Pursuant to the perceived mandate of the 1994 Report, however, the Department's 1994 valuation of Basin assumed the highest and best use of Basin's assets is as an income-producing electric generation and transmission property from the perspective of a profit-motivated investor. The Department valued Basin assets in 1994 assuming the typical buyer would be an investor-owned utility (IOU), an assumption used in all approaches to value as a result of the Board's Report.

Although the Decision states that Basin does not contest the Department's finding that the highest and best use of the assets at issue is for electric generation and transmission, that statement is misleading. The highly specialized nature of the facility precludes it from being used for any other purpose. The controversy here is whether the Department's distinction between non-profit/for-profit entities is rationally based on fact or authorized by law. The Decision fails to address the issue beyond the bald assertion, at the beginning of its findings of fact and its conclusions of law, that Basin should be valued differently because the highest and best use of the property is no longer as a non-profit REC.[6]

---

5. For the most part, the experts for Platte County and the Department used the methodologies suggested in the Report, while Basin's expert used pre-Report methodologies.

6. The Board's entire basis for applying the valuation methods differently is found in the following paragraphs in the Decision. Its findings of fact include the following (footnotes omitted):

The only citation to any legal authority in the Decision's discussion of highest and best use is a footnote citation to a treatise, *The Appraisal of Real Estate* (10th ed.1992). At page 275, the treatise defines "highest and best use" as "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in highest value." THE APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 275 (10th ed.1992). Conspicuously absent from the Decision is any reference to the Board's rules, Wyoming statutes, or case law. The Decision fails to indicate any rule or statute directing the Department to value property at its highest and best use or, more importantly, what such a determination would entail. *See In the Matter of Bessemer Mountain, Rissler & McMurry v. Environ-*

*mental Quality Council,* 856 P.2d 450, 454 (Wyo.1993) ("[T]he administrative agency must invoke expertise to create standards, which will furnish notice to the public of how the decision may be reached. The creation of such standards serves to eliminate any need to develop standards on a case by case basis, which is time-consuming; may lead to inconsistent results; and severely inhibits judicial review.")

Of particular concern here is the absence of authority supporting the application of the highest and best use analysis to differentiate between non-profit and for-profit entities. In this case, the "use" of the property is as an electric utility. The entity's financial and management structure is simply irrelevant to a "highest and best use" analysis.

The Board's analysis then leaps from defining highest and best use as "the reason-

4. The Department 1994 valuation of Basin assets is based on the assumption the highest and best use of Basin assets is as an income-producing electric generation and transmission property from the perspective of a profit-motivated investor. Basin does not contest the highest and best use of its assets at issue is for electric generation and transmission. Additional clarification is needed, however, to better understand the context in which the Department's appraisal was made.

5. The Department valued Basin assets in 1994 assuming the typical buyer would be an investor-owned utility (IOU). The Department used the perspective of an IOU buyer in all approaches to value as a result of a material finding in this Board's 1994 Investigative Report *In the Matter of the Property of Rural Wyoming Electric Cooperative Utilities* (May 3, 1994). The Board said at that time:

The Department conclusion on highest and best use [in its 1993 investigation] is also erroneous as a matter of appraisal principles, and is internally inconsistent ... [Highest and best use] relates to the typical investor's conclusions about the most profitable use of a property, and has nothing to do with whether or not the current owner seeks a profit. Further, it is inconsistent for the Department to defend its capitalization rate, which is based on data relating to IOU [investor-owned utilities] properties and, in the same document, conclude the most profitable use of the property is as a nonprofit operation.

6. Basin argues it cannot achieve the imputed income derived by the Department under the income and cost approaches assuming an average return on equity or return on investment achieved by investor-owned utilities operating in Wyoming. Basin, however, did

not otherwise provide any evidence of the nature of the "typical investor."
In the Decision's conclusions of law we find:
79. Clearly the present and actual use of the property is not intended to generate profit, but rather to provide power to its owners at the lowest possible cost. Basin uses its property to maximize cost savings;· a prospective profit-motivated purchaser would seek to maximize return of and on investment. Mr. Goodwin's remarks are instructive: "A property's highest and best use is not contingent on the kind of owner, whether it be a co-op or some other kind of nonprofit entity or a sub S corporation or an individual, it shouldn't have any effect on the underlying market value of those assets. We want to try to measure the earning capacity at their highest and best use." He further said, "I need to assume that we have a typical owner and a typical purchaser. That's the context that every market value appraisal should be made within." Maximizing cost savings is but the flip side of the same profit-motivating coin. It is therefore reasonable to view highest and best use from the perspective of a potential investor seeking to maximize earning capacity in order to quantify the benefits of ownership Basin's members/owners/consumers receive. While it is important to value the assets *as is*, that is, in their current condition and in consideration of current market conditions, we conclude it is just as important to view the assets from the perspective of a potential profit-motivated purchaser throughout each valuation analysis in order to be consistent. Accordingly, we conclude the highest and best use assumed by the Department in the 1994 appraisal, which was as an income-producing electric generation and transmission property from the perspective of a profit-motivated investor, is appropriate.

ably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in highest value" to a "most profitable" analysis and concludes that Basin would be more profitable if it was a for-profit entity. However, the Board's own definition of highest and best use contains absolutely no mention of "most profitable." In fact, while "results in highest value" may relate to "most profitable," the Board's Decision is devoid of findings or analysis concerning the other factors found in the definition of highest and best use.

"[The] highest and best use is shaped by the competitive forces within the market where the property is located. Therefore, the analysis and interpretation of highest and best use is an economic study of market forces focused on the subject property." APPRAISAL OF REAL ESTATE, *supra*, at 275–76. Reviewing the Decision, we find no evidence that the Department or the Board undertook the necessary economic study of the market forces affecting Basin's property. The purpose of WYO. STAT. § 16-3-110 (1997) [7] is "to require the articulation of basic facts from which ultimate findings of fact are determined in order to facilitate judicial review." *Harris v. Wyo. Tax Comm'n*, 718 P.2d 49, 51 (Wyo.1986).

The Board's conclusory "finding" that the highest and best use of Basin's property is as an investor-owned utility is unsupported by the law or basic facts necessary for such a determination. We do not uphold agency decisions which are not supported by basic facts, properly applied to the law. Therefore, we reverse the Board's determination that the highest and best use of Basin's property is as an investor-owned utility.

*All Requirements Contracts*

"A general tenet of property tax law is that when land is subject to a restriction which affects its value, then that restriction should be considered in determining the property's fair market value." *CAT Partnership v. County of Santa Cruz*, 63 Cal.App.4th 1071, 74 Cal.Rptr.2d 652, 660 (1998). "This principle is related to the requirement that the land be valued at its highest and best use subject to the condition that the use be one which is legally permissible." *Id.* "A use which is forbidden because of an enforceable restriction is generally a use that is not legally permissible." *Id.*

Basin is a super generation and transmission association. Basin sells its power to smaller generation and transmission cooperatives and to a small number of distribution cooperatives, which are known as "Class A members." The Class A members then sell the power to rural electric distribution cooperatives which distribute power to the ultimate retail consumer. Basin has been a nonprofit entity since its inception. Basin's Articles of Incorporation provide that "[t]he Association shall at all times be operated on a cooperative non-profit basis for the mutual benefit of its patrons."

Basin's Class A members purchase power from the Western Area Power Administration, which administers the hydroelectric facilities of the federal government. If the members have any additional electricity requirements, they must be purchased from Basin, pursuant to contracts known as "all-requirements contracts." In its Decision the Board quoted from one of Basin's typical all-requirements contracts, which provides for review and revision of rates

so that it shall produce revenues which shall be sufficient, *but only sufficient*, with the revenues of the seller from all other sources, to meet the cost of the operation and maintenance ... of the generating plants, the transmission system and related facilities of the seller ... and to provide for the establishment and maintenance of reasonable reserves.

Rural Electric Cooperatives (RECs), such as Basin, receive financing from the Rural Electric Association (REA). In return for

---

7. WYO. STAT. § 16-3-110 provides:
 A final decision or order adverse to a party in a contested case shall be in writing or dictated into the record. The final decision shall include findings of fact and conclusions of law separately stated. Findings of fact if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings....

that financial assistance, the REA regulates and supervises RECs. The REA requires RECs to obtain all-requirements contracts, described above. These contracts are then pledged to the REA as security for the debt. The REA not only approves the all-requirements contracts; it also determines whether the REC's rates are too high or too low. The all-requirements contracts limit Basin's rates to amounts necessary to cover Basin's costs, plus a margin.

Against that background, we examine the applicable rules of the Department of Revenue. Chapter XXXIII of the Board's Rules sets forth accepted valuation methods for state-assessed properties. To determine "fair market value" with the "willing buyer/willing seller" standard, RULES, Ch. XXXII, Section 4(g), appraisal techniques which may be used by the Department, provide for consideration of the "regulatory and economic environment." RULES, Ch. XXXIII, Section 6. When using the income approach, the cash flow or income to be capitalized "must also take into account all legally enforceable restrictions on the property." RULES, Ch. XXXIII, Section 6(b)(iii)(B)(1).

▮ Basin takes issue with the Board's determination that Basin's all-requirements contracts are not legally enforceable restrictions. Basin argues that the all-requirements contracts are legally enforceable restrictions affecting its ability to generate income and should be considered when using the income approach to determine its value. The question presented is a legal one: whether a property owner's participation in a non-profit rural electric cooperative constitutes a "legally enforceable restriction on the property" which must be taken into account in the income approach to value.

The types of restrictions that constitute enforceable restrictions have been described as virtually any government restriction designed to serve the interest of public health, safety, morals and/or general public welfare. As one commentator stated, "Generally, any sort of binding agreement with a government agency should qualify [as an enforceable restriction]...."

*CAT Partnership*, 74 Cal.Rptr.2d at 659 (citations omitted).

The Oregon Supreme Court ad valorem tax decision, *Bayridge Associates Ltd. Partnership v. Dept. of Rev.*, 321 Or. 21, 892 P.2d 1002 (Or.1995), which the Board cites in its discussion of the tax benefit transfer issue,[8] provides a useful discussion of a similar question. *Bayridge* interpreted an Oregon statute which required the taxing authority to adjust market value to reflect or take into account "governmental restrictions as to use." *Bayridge*, 892 P.2d at 1005. The "[t]axpayers entered into an agreement with OHA that limited the rents that taxpayers could charge to tenants residing in taxpayers' properties and limited the pool of tenants to whom they could rent apartments," *id.* at 1006, in exchange for section 42 federal tax credits. *Id.* at 1004–06. Like the Board here, the taxing authority in *Bayridge* argued that "availability of section 42 tax credits does not create a 'governmental restriction,' because (a) the taxpayer chooses to participate in the program and (b) the program results in financial gain to the taxpayer." *Id.* at 1005.

The *Bayridge* court opined:

Nothing in the text of [the statute] suggests that a "governmental restriction" must be involuntary at its inception. Neither does the text suggest that a taxpayer may not derive an economic benefit from a "governmental restriction." The text of [the statute] does not distinguish between voluntary and involuntary, or between beneficial and non-beneficial, "governmental restrictions." We are not at liberty to read in such requirements.

*Id.* We agree with that reasoning. Nothing in the Department's rules requires that the legally enforceable restriction be involuntary. The Board's conclusion that the all-requirements contracts "cannot be considered a governmental limitation commonly referred to as police power—the right of the government to

---

8. The tax benefit transfer issue concerned valuation pursuant to the "cost approach" to value. As such, the Board's reliance on the "legally enforceable restriction" language from the income approach section of the rules appears to be inappropriate.

impose reasonable limitations to protect and promote the health, safety and general welfare of the public, like zoning," is not supported by the rule's text or any fair reading thereof. The all-requirements contracts are binding agreements with a government agency, limiting Basin's profit. They are, therefore, a legally enforceable restriction and must be recognized in the income approach to valuation.

*Imputed Income* [9]

■ By virtue of the Board's Investigative Report (1994), the Department assumed that using the actual income of Basin did not capture all of the economic benefits members received in the form of rates lower than otherwise would have been charged. The Department then used financial data from comparable companies using price/earnings ratios to impute the level of income. Basin's projected annual income was $130,000,000, while the Department's imputed income level for Basin was $160,454,020.

The Board determined that Basin's non-profit status mandated by the all-requirements contracts requires it to charge below market rates and concluded that the "Department appropriately capitalized 'market rent' when it imputed a level of income based on the earnings/price ratios of companies in the same general line of business as Basin."

However, use of "market rent" to impute income ignores the legally enforceable restriction found in the all-requirements contracts. As discussed earlier, the Board's rules require it to take into account legally enforceable restrictions when applying the income approach to value. "Throughout [valuation] cases [we find] the rule ... that tax authorities should take into consideration all factors which relate to value." *J. Ray McDermott & Co. v. Hudson,* 370 P.2d 364, 368 (Wyo.1962). The legally enforceable restrictions may not be ignored. Therefore,

the Department erred when it capitalized an imputed income rather than Basin's actual income.

*Capitalization Rates*

■ In the Board's Decision we find the following: "In the Board's 1994 Investigative Report we found a non-profit stream of income could not be capitalized with a for-profit capitalization rate." The Board then found that direct capitalization techniques and methodologies were proper methodologies, properly applied to Basin. However, the Department imputed a for-profit income to Basin, then applied a direct capitalization rate, different from the yield capitalization rates it applied to for-profit utilities, because Basin is a non-profit company. It is logically inconsistent to impute a for-profit income and then to apply a capitalization rate which appears to be designed for use with a non-profit stream of income. Additionally,

> [The direct capitalization] model requires the use of P/E (price/ earnings) ratios, *i.e.,* mathematical ratios derived from comparing the price at which particular companies' stock sold with the earnings of those companies. If an appraiser uses P/E ratios, it is vital that the ratios be for "comparable" companies, *i.e.,* be derived from companies sufficiently similar to the company being evaluated to make use of the ratios analytically meaningful.

*Union Pacific Railroad Co. v. Dept. of Rev.,* 315 Or. 11, 843 P.2d 864, 874 (Or.1992).

The Department takes the untenable position that non-profit utilities are sufficiently different from investor-owned utilities to justify use of different valuation methodologies and capitalization rates, yet uses investor-owned utilities as "comparables" in its direct capitalization approach. The direct capitalization approach takes on many of the same

---

9. Without reaching the issue on the merits, we note that this Court has held that use of hypothetical costs and hypothetical royalties is inappropriate in determining valuation for tax purposes. *Appeal of Monolith Portland Midwest Co., Inc.,* 574 P.2d 757, 761 (Wyo.1978); *Hillard v. Big Horn Coal Co.,* 549 P.2d 293, 301 (Wyo. 1976). Absent compelling evidence and legal argument that use of imputed income is appro-

priate and other non-profit entities are treated in the same manner, it is improper to impute income to a taxpayer when using the income capitalization approach to value. *See also Recreation Centers of Sun City, Inc. v. Maricopa County,* 162 Ariz. 281, 782 P.2d 1174, 1182 (Ariz.1989) (income approach is inappropriate for valuing non-profit cooperative).

characteristics as the stock and debt approach to value. *Union Pacific*, 843 P.2d at 874. The Board determined that the stock and debt approach was so unreliable that it gave no weight to that approach in its final determination. It logically follows that the direct capitalization rate must be just as unreliable.

The Board's rationale for using a direct capitalization rate, rather than the same yield capitalization rate it uses for those purportedly "comparable" companies, is arbitrary, capricious and not in accordance with the law. The Department has not sufficiently defended, and the Board has not sufficiently justified, the application of different capitalization rates. Therefore, we reverse the Board's conclusion that "direct capitalization techniques and methodologies employed by the Department were proper methodologies and were properly applied."

*Separate Classification of Non-profit Utilities*

■ The Wyoming Constitution mandates uniform assessment and equal and uniform taxation. Wyo. Const. Art. 15, § 11.

Early on, Justice Blume recognized a truth inherent in the area of property valuation: "There is no such thing as absolute value. A stone cannot be other than a stone, but one man may give a different valuation to a piece of land than another." *Bunten v. Rock Springs Grazing Ass'n*, 29 Wyo. 461, 475, 215 P. 244, 248 (1923). Accordingly, this court has consistently interpreted Wyo. Const. art. 15, § 11 to require "only a rational method [of appraisal], equally applied to all property which results in essential fairness."

*Holly Sugar Corp. v. State Bd. of Equalization*, 839 P.2d 959, 964 (Wyo.1992).

■ "The Constitutional command is that the Legislature shall provide for a uniform and equal rate of assessment and taxation. Assessment is a prerequisite to the application of any rate of taxation, and assessment includes listing and valuation. This is fundamental, and cannot be evaded by any shift or device whatever." *Rocky Mountain Oil and Gas Assoc. v. State Bd. of Equalization, Department of Revenue and Taxation*, 749 P.2d

221, 235–36 (Wyo.1987). The Investigative Report directed the Department to treat non-profit utilities differently from investor-owned utilities, resulting in a *de facto* classification. "In ad valorem taxation, a rational basis for a disputed classification must be shown with equal treatment of similarly definable taxpayers." *Id.* at 236. Appraisal methods must be equally applied to all property within the class. *Holly Sugar*, 839 P.2d at 963–64 *and see Union Pacific R.R. v. Bd. of Equalization*, 802 P.2d 856, 862–63 (Wyo. 1990) (Urbigkit, C.J., specially concurring). "Discrimination may arise in various ways, for instance by the adoption of a wrong or illegal rule, principle, or method; and an unjust tax resulting therefrom has frequently been enjoined as illegal." *J. Ray McDermott*, 370 P.2d at 369.

■ Pursuant to our analysis of the Board's Investigative Report and the Department's subsequent valuation of Basin's property in accordance with that Report, we find that the Board's decisions affirming the Department's valuation constituted an abuse of discretion and were unconstitutional. As discussed above there is no rational basis in the record for treating non-profit and for-profit entities differently. We hold that the tax is on the property, not the owner, and a valuation for tax purposes must value the property, not the ownership type. *See Recreation Centers of Sun City, Inc. v. Maricopa County*, 162 Ariz. 281, 782 P.2d 1174, 1181 (Ariz. 1989).

### CONCLUSION

We reverse and remand Case No. 97–3 for further action in accordance with this opinion. Because the board of county commissioners lacks standing to appeal from a decision of the State Board of Equalization, Case No. 97–4 is dismissed for lack of jurisdiction.