2004 WY 89

**AMOCO PRODUCTION COMPANY,**
Appellant (Petitioner),

v.

**DEPARTMENT OF REVENUE, State of Wyoming and Board of County Commissioners of Uinta County, Appellees (Respondents).**

No. 02–171.

Supreme Court of Wyoming.

July 23, 2004.

Representing Appellant: John L. Bordes, Jr., of Oreck, Bradley, Crighton, Adams & Chase, Boulder, Colorado; Robert A. Swiech, Associate General Tax Counsel, BP America, Inc., Houston, Texas. Argument by Mr. Swiech.

Representing Appellee Wyoming Department of Revenue: Patrick J. Crank, Wyoming Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; Karl D. Anderson, Senior Assistant Attorney General. Argument by Mr. Anderson.

Representing Appellee Board of County Commissioners of Uinta County: Bruce A. Salzburg of Freudenthal, Salzburg & Bonds, P.C., Cheyenne, Wyoming.

Before GOLDEN, LEHMAN, KITE, and VOIGT, JJ., and BROOKS, D.J.

GOLDEN, Justice.

[¶ 1]   This is an appeal by Amoco Production Company (Amoco) from a decision by the State Board of Equalization (Board) assessing Amoco on underpayment of severance taxes and increasing gross product valuation on gas produced from the Whitney Canyon field in Uinta County for the production years 1990 through 1992.  We will affirm in part and reverse in part.

## ISSUES

[¶ 2]   Amoco presents the following issues for review:

A.  Uinta County lacks appeal rights in this matter.

B.  Royalties and production taxes are not properly included in the direct cost ratio as costs of producing.

C.  The decision of the Board confirming the Department's point of valuation was unsupported by substantial evidence and otherwise not in accord with Wyoming law.

D.  The Department's disallowance of processing and transportation related expenses was arbitrary, capricious, an abuse of discretion and unsupported by substantial evidence.

E.  The imposition of penalties was improper.

The Wyoming Department of Revenue states the issues as:

I.  Did the State Board correctly conclude that the point of valuation for Amoco's Whitney Canyon production was the inlet to the initial transportation related compressor?

II.  Did the State Board correctly conclude that Amoco failed to meet its burden of proof in regard to Amoco's claim that certain expenses were associated with processing at the Whitney Canyon Plant?

III.  Did the State Board correctly conclude that the imposition of penalties by the Department was proper and justified?

IV.  Did the State Board correctly conclude that production taxes and royalties are direct production costs?

The Board of County Commissioners of Uinta County states the issues as:

Whether the Board of County Commissioners of Uinta County was properly permitted to intervene as a party in the contested case hearing before the State Board of Equalization?

Whether, if the County was properly allowed to intervene in this case, the Board of Equalization could consider the propriety of the Department of Revenue's proportionate profits calculation used to assess Appellant's production in the years at issue in the case?

Whether the "direct cost ratio" used in calculating the taxable value of oil and gas production under the proportionate profits method includes production taxes and royalties as "direct costs of producing" the oil and gas?

## FACTS

[¶ 3]   In 1994, the Department of Audit (DOA) engaged an audit of Amoco's Whitney Canyon production for the years 1989 through 1992. In 1996, pursuant to the results of the audit, the Department of Revenue (the Department) issued a deficiency assessment against Amoco.  Amoco timely appealed the deficiency assessment to the Board.

[¶ 4]   Amoco and the Department eventually settled all issues involving the production year 1989.  The only issues on appeal concern production years 1990 though 1992. Amoco valued its production during the years at issue under the proportionate profits methodology.[1]  Uinta County intervened in

1.  The proportionate profits methodology is defined by Wyo. Stat. Ann. § 39–2–208(d)(iv) (Michie 1997) recodified as § 39–14–203(b)(vi) (LexisNexis 2003):

    (D) Proportionate profits—The fair market value is:

    (I) The total amount received from the sale of the minerals minus exempt royalties, nonex-

empt royalties and production taxes times the quotient of the direct cost of producing the minerals divided by the direct cost of producing, processing and transporting the minerals; plus

    (II) Nonexempt royalties and production taxes.

the administrative action and challenged the decision by the Department to not include production taxes and royalties as direct production costs within the context of the proportionate profits equation.

[¶ 5] Ultimately, the Board ruled in favor of Uinta County on the issue it raised and against Amoco on the issues Amoco initially appealed. Amoco requested and was granted reconsideration by the Board, but the reconsidered opinion contained no substantive changes to the issues herein appealed. Amoco timely appealed both the initial decision and the reconsidered opinion to district court. The district court certified the case to this Court pursuant to W.R.A.P. 12.09(b). Further details will be provided during the discussion of each issue as necessary.

## STANDARD OF REVIEW

[¶ 6] When reviewing administrative decisions, this Court is guided by Wyo. Stat. Ann. § 16–3–114(c)(ii) (LexisNexis 2003), which provides in pertinent part:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

* * * *

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

This Court will defer to an agency's findings of fact if they are supported by substantial evidence. *Whiteman v. Workers' Safety and Comp. Div.*, 984 P.2d 1079, 1081 (Wyo.1999). Substantial evidence is "relevant evidence that a reasonable mind can accept as adequate to support an agency's conclusion." *Id.* (quoting *Casper Oil Co. v. Evenson*, 888 P.2d 221, 224 (Wyo.1995)). We will affirm an agency's conclusions of law only if they are in accordance with the law. *Snyder v. State ex rel. Workers' Comp. Div.*, 957 P.2d 289, 293 (Wyo.1998). When an agency's determinations involve elements of law and fact, or ultimate facts, we do not give them the same deference we reserve for findings of basic fact. *Basin Electric Power Coop., Inc. v. Dep't of Revenue*, 970 P.2d 841, 850 (Wyo. 1998). Instead, we separate the factual elements from the legal elements to determine whether the appropriate rule of law has been correctly applied to the facts and defer to the agency's ultimate factual finding only if there is no error in either stating or applying the law. *Id.* at 850–51. To the extent the controversy in the case at bar involves the proper application of appraisal methods to the facts, this is an issue of ultimate fact and requires de novo review. *Id.* at 851.

[¶ 7] The Department's valuations for state-assessed property are presumed valid, accurate, and correct. *Chicago, Burlington & Quincy R.R. Co. v. Bruch*, 400 P.2d 494, 498–99 (Wyo.1965). This presumption can only be overcome by credible evidence to the contrary. *Id.* In the absence of evidence to the contrary, we presume that the officials charged with establishing value exercised honest judgment in accordance with the applicable rules, regulations, and other directives that have passed public scrutiny, either through legislative enactment or agency rule-making, or both. *Id.*

[¶ 8] The petitioner has the initial burden to present sufficient credible evidence to overcome the presumption, and a mere difference of opinion as to value is not sufficient. *Teton Valley Ranch v. State*

*Board of Equalization,* 735 P.2d 107, 113 (Wyo.1987); *Chicago, Burlington & Quincy R.R.,* 400 P.2d at 499. If the petitioner successfully overcomes the presumption, then the Board is required to equally weigh the evidence of all parties and measure it against the appropriate burden of proof. *Basin,* 970 P.2d at 851. Once the presumption is successfully overcome, the burden of going forward shifts to the Department to defend its valuation. *Id.* The petitioner, however, by challenging the valuation, bears the ultimate burden of persuasion to prove by a preponderance of the evidence that the valuation was not derived in accordance with the required constitutional and statutory requirements for valuing state-assessed property. *Id.*

## DISCUSSION

### Standing of Uinta County to Intervene

[¶ 9] During the audit process, Amoco and the Department agreed that production taxes and royalties should not be included as direct production costs in the proportionate profits equation. This decision reduced Amoco's tax obligation. After receiving the final deficiency notice from the Department, Amoco appealed to the Board on other issues. In September 1997, Uinta County moved to intervene. In May 1998, Uinta County filed its preliminary statement, which, for the first time, challenged the decision by the Department to not include production taxes and royalties as direct production costs.

[¶ 10] Amoco immediately filed a motion to vacate the order allowing intervention. The Board denied Amoco's motion without discussion or analysis. Uinta County remained a party to the action. Ultimately, the Board ruled in favor of Uinta County on the issue of its proffered definition of direct production costs. In its final order, the Board reviewed its decision to allow Uinta County to intervene. In essence, the Board simply determined that intervention by Uinta County was appropriate in the name of judicial economy.[2] On appeal, Amoco argues that

Uinta County should never have been allowed to intervene.

[¶ 11] Amoco presents a very fundamental argument. Amoco argues a county has no sovereign authority beyond that granted by the legislature. *State v. Bd. of Cty. Comm'rs of Johnson Cty.,* 642 P.2d 456, 457–58 (Wyo.1982). Amoco contends the legislature has never expressly granted a right to counties to intervene in Board actions between a taxpayer and the Department. Thus, Amoco argues, Uinta County simply lacks capacity to intervene.

[¶ 12] We believe this argument over-simplifies the issue. In general, intervention is simply a means by which an outsider with an appropriate interest may come into an existing action. The first inquiry is whether intervention in general is allowed in a contested case before the Board, and, assuming the answer is yes, our second inquiry is whether a county meets the criteria for intervention.

[¶ 13] We begin by examining the jurisdiction granted to the Board by the legislature. The Board's authority to hear contested cases is found in Wyo. Stat. Ann. § 39–1–304(a) (Michie 1997), recodified as § 39–11–102.1(c) (LexisNexis 2003):

> The state board of equalization shall perform the duties specified in article 15, section 10 of the Wyoming constitution and shall hear appeals from county boards of equalization and review final decisions of the department upon application of any interested person adversely affected, including boards of county commissioners for the purposes of this subsection, under the contested case procedures of the Wyoming Administrative Procedure Act.

According to this statute, all contested cases before the Board are governed by the contested case procedures of the Wyoming Administrative Procedure Act (WAPA). Turning then to the WAPA, we find that intervention is provided for within the definition of "party": " '[p]arty' means each

---

2. Because, for purposes of this appeal, there is no substantive difference between the Board's original opinion and its reconsidered opinion, all references to the opinion of the Board will refer solely to the reconsidered opinion.

person or agency named or admitted as a party or properly seeking and entitled as of right to be admitted as a party." Wyo. Stat. Ann. § 16–3–101(b)(vi) (LexisNexis 2003). Since a county is an agency under WAPA definitions pursuant to Wyo. Stat. Ann. § 16–3–101(b)(i) (LexisNexis 2003), § 16–3–101(b)(vi) allows for the possibility of a county intervening in a contested case if it can do so as of right.

[¶ 14] Intervention as of right is a well-recognized legal concept. While the legal requirements for intervention as of right are discussed in many cases, the requirements are reflected succinctly in W.R.C.P. 24(a):

(a) *Intervention of right.*—Upon timely application anyone shall be permitted to intervene in an action:

(1) When a statute confers an unconditional right to intervene; or

(2) When the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The Board has promulgated its own rule of procedure directly applicable to intervention in contested case proceedings before the Board. The pertinent language of the Rule reads:

(a) Upon timely motion, any person, including a board of county commissioners, may be permitted to intervene in a case: (1) when a statute confers an unconditional right to intervene; or (2) when the movant claims an interest relating to the matter or transaction which is the subject of the case and is so situated that the disposition of the case may as a practical matter impair or impede his ability to protect that interest.

Rules of Practice and Procedure for Cases Before the Wyoming State Board of Equalization, ch. 2, § 14 (Oct. 22, 2001).

[¶ 15] The Board rule roughly follows W.R.C.P. 24(a). Significantly, however, the Board rule omits the condition that an applicant does not qualify to intervene as of right if its interests are adequately represented by existing parties. This condition is an established requirement for intervention as of right and as such the Board is not at liberty to omit it. By omitting this condition, the Board is attempting to expand the circumstances under which a party may intervene in a contested case beyond what is authorized by the legislature in the WAPA. "Administrative agencies have only those powers expressly conferred by statute. This legal principle applies with equal force to an agency's authority to promulgate rules. Rules promulgated in excess of an agency's statutory authority are null and void." *State ex rel. Dep't of Revenue v. Buggy Bath Unlimited, Inc.*, 2001 WY 27, ¶ 10, 18 P.3d 1182, ¶ 10 (Wyo.2001) (citations omitted). The Board's rule regarding intervention is void because it does not accurately reflect the full legal requirements of intervention as of right.

[¶ 16] Although the Board rule on intervention is not valid, the Board still has authority under the WAPA to allow a county to intervene if the county qualifies for intervention as of right. We return to W.R.C.P. 24(a) for the appropriate guidance to determine if a county may intervene into a valuation dispute between a taxpayer and the Department as of right. A fundamental requirement of being allowed to intervene as of right is a significant, legally protectable interest.

While we may agree that Rule 24(a) lends itself to liberal construction, it is also true that one seeking intervention must present a significant protectable interest in the suit, rather than one that is contingent. *O'Hara Group Denver, Ltd. v. Marcor Housing Systems Inc.*, Colo., 197 Colo. 530, 595 P.2d 679 (1979); *In re Penn Central Commercial Paper Litigation*, 62 F.R.D. 341 (1974), aff'd without opinion 515 F.2d 505 (2nd Cir.1975). Appellants were, therefore, obliged to demonstrate that they had a significant interest in the present litigation and not one that was merely contingent or similar to the interest of any member of the public at large.

*Platte County School Dist. No. 1 v. Basin Elec. Power Co-op.*, 638 P.2d 1276, 1279

(Wyo.1982). Certainly counties have a pecuniary interest in the taxable value of property as determined by the Department. Counties may levy and collect ad valorem taxes. Ad valorem taxes are based upon the taxable value of property as established by the Department. This pecuniary interest, however, does not translate necessarily into a legally protectable interest in the statutorily defined valuation process.

[¶ 17] Uinta County argues that § 39–11–102.1(c), quoted above, evidences a legislative intent that counties have a legally protectable interest in the valuation process. This Court recently has had occasion to discuss the impact of W.S. § 39–11–102.1(c) on the role of counties in the valuation process. While we agree that the legislature has granted counties limited appeal rights from a final decision of the Department, the exact scope of the authority the legislature has granted to counties is not entirely clear:

> We conclude that by amending Wyo. Stat. Ann. § 39–11–102.1(c) in 1995, the legislature intended to grant counties the authority to file contested cases from final decisions of the DOR. Unfortunately, the legislature left intact several statutes which specify only the taxpayer and the Department as having rights to appeal. It did not indicate what decisions could be challenged by the county, or when. It failed to indicate how county appeals fit into the amended return and audit process. By granting counties the right to appeal, the legislature may have effectively eliminated any possibility of settlement of tax disputes under Wyo. Stat. Ann. § 39–11–103(b) (LexisNexis 2001) because, even if a dispute is settled, there is the risk of an appeal by a county. We urge the legislature to remedy these problems by clearly indicating its intent with respect to county appeals of ad valorem taxes and by clearly defining the scope and process for such appeals.

*Bd. of Cty. Comm'rs for Sublette Cty. v. Exxon Mobil Corp.*, 2002 WY 151, ¶ 30, 55 P.3d 714, ¶ 30 (Wyo.2002). Unfortunately, as yet the legislature has not offered any clarification.[3]

[¶ 18] Guided by certain rules of statutory construction, the *Exxon* Court puzzled over the possible parameters of the appeal authority granted to the counties by the legislature:

> "Courts may try to determine legislative intent by considering the type of statute being interpreted." *Basin Elec. Power Coop. v. Bowen*, 979 P.2d 503, 509 (Wyo. 1999). "Tax statutes are to be construed in favor of the taxpayer and are not to be extended absent clear intent of the legislature." *Id.* (citing *Chevron, U.S.A., Inc. v. State*, 918 P.2d 980, 985 (Wyo.1996)).
>
> > In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government and in favor of the citizen.
>
> *Chevron, U.S.A., Inc. v. State*, 918 P.2d 980, 984–85 (Wyo.1996) (citing *Kelsey v. Taft*, 72 Wyo. 210, 219–20, 263 P.2d 135, 138 (1953) (quoting *Gould v. Gould*, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211 (1917))). The same principles of strict construction apply to statutes which grant authority to political sub-entities. "Since enabling legislation, through which all subordinate governmental instrumentalities must receive their authority, is a grant of sovereign power, it is subject to the usual rule of strict construction applicable to such grants." Norman J. Singer, *Statutes and Statutory Construction* § 64:1 (6th ed.2001 rev.) (footnote omitted). Because § 39–11–102.1(c) (LexisNexis 2001) is both a tax statute and one we are being asked to construe as a delegation of power from the State of Wyoming to the counties, we hold that it is appropriate to strictly construe it.
>
> Assuming that the legislature intended to give some degree of authority to counties to appeal in ad valorem tax cases,

---

3. Interestingly, one of the reasons given by Uinta County justifying its right to intervene was to prevent Amoco and the Department from settling any issues without participation by Uinta County.

principles of strict construction require us to conclude that it did not intend the scope of such an appeal to extend into areas specifically addressed in other statutes. Specific statutes control over general statutes involving the same subject. *Thunderbasin Land, Livestock & Inv. Co. v. Laramie County,* 5 P.3d 774, 782 (Wyo.2000). Consequently, a county's appeal may not challenge valuation methodology. Such appeals are governed by Wyo. Stat. Ann. § 39-14-203(b) (LexisNexis 2001). Such an appeal may not challenge an annual value certification, as that matter is addressed by Wyo. Stat. Ann. §§ 39-13-102(n) and 39-14-209(b)(iv) (LexisNexis 2001). The County cannot force an audit of a taxpayer through a contested case, as that responsibility is given to the Departments of Audit and Revenue under Wyo. Stat. Ann. § 39-14-208(b) (LexisNexis 2001). It follows that the County's appeal must be limited in scope to specific errors allegedly committed by the DOR.

*Exxon,* ¶¶ 32, 33.

[¶ 19] Ultimately the *Exxon* Court did not have to define the appeal powers of a county because it determined that the valuation notice being appealed by the county was not a final, appealable order. Still, the statutory framework described above allows counties only a very limited role in the valuation process. In *Exxon,* we excluded participation by the counties in all matters that are governed by a specific statute. Thus we specifically held that a county could not seek review of valuation methodology or the annual valuation certification.

[¶ 20] Remembering our rule of strict construction, and given that the legislature has made no further amendments to the relevant tax statutes, we find that the legislature did not intend to expand the role of the counties in the valuation process. We have previously summarized the roles of the parties in the property valuation process:

There exists then, under current state taxation methodology, three state players and the counties: the state Department of Revenue with the collection and taxation supervision responsibilities; the State Board of Equalization with a semi-judicial appeal and supervisory responsibility; and the Mineral Audit Division of the Department of Audit with a delinquency audit responsibility; and finally, county governments which have a direct pecuniary interest in the collection of the ad valorem tax. Value is established by the Department of Revenue subject to appeal to the State Board of Equalization with the function of the counties regarding ad valorem tax only limited to a quantities validation program for collection.

*Union Pacific Resources Co. v. State,* 839 P.2d 356, 377 (Wyo.1992). We believe the role of the counties remains the same. The only difference is that now a county can bring a contested case before the Board to challenge Department findings as to quantity or any similar alleged error. A county cannot challenge a decision by the Department regarding valuation methodology or any substantive decision regarding the application of a chosen valuation methodology, including the definition of inputs into valuation equations.

[¶ 21] Returning to the argument presented by Uinta County, we do not agree that § 39-11-102.1(c) expresses a legislative intent to create a greater role for counties in the valuation process. The legislature has not expressly expanded the role of counties beyond a very limited involvement in the valuation process, and we decline to do so under the guise of statutory interpretation. The statute referenced by Uinta County does not confer upon counties the requisite interest to intervene as of right into a contested case before the Board brought by a taxpayer against the Department challenging substantive methodology decisions by the Department regarding valuation.

[¶ 22] Given the statutorily limited role of counties in the valuation process, even should we find that counties have the requisite interest for intervention, we are compelled to find that the interests of the counties is already adequately represented by the Department. The legislature has developed a framework in which valuation is the unique function of the Department. Not even the Board can challenge that function by changing definitions adopted by the Department. This Court

previously has differentiated between the functions assigned to the Board and the functions assigned to the Department:

> We begin by summarizing the statutory structure of the Department and the Board [of Equalization]. The Board is a constitutional body, and the legislature is required to establish a Board of Equalization charged with the duty to equalize the valuation of all property in the state. Wyo. Const. art. 15, §§ 9 & 10. In Wyo. Sess. Laws. ch. 174, §§ 39–1–101, *et seq.* (1991), the legislature created the Department as a separate agency from the Board, and assigned to it administrative functions relating to taxation and revenue that previously had been the responsibilities of the Board. *Union Pacific Resources Co. v. State,* 839 P.2d 356, 363 (Wyo.1992) (*UPRC I*). It specifically charged the Department with the function of valuation of property for purposes of tax assessment, "while the Board 'became an independent quasi-judicial organization with constitutional and statutory duties to equalize valuation and decide disagreements regarding statutory provisions affecting the assessment, levy and collection of taxes.' *UPRC I,* 839 P.2d at 363." *Union Pacific Resources Co. v. State Bd. of Equalization for the State of Wyo.,* 895 P.2d 464, 466 (Wyo.1995) (*UPRC II*).

*Amoco Production Co. v. Wyoming State Bd. of Equalization,* 12 P.3d 668, 672 (Wyo.2000). This Court determined that the functions were distinct:

> The only way to harmonize the various descriptions of the review or appeal function of the Board is to hold that the Board is limited to an adjudicatory decision making its review on the record. It is only by either approving the determination of the Department, or by disapproving the determination and remanding the matter to the Department, that the issues brought before the Board for review can be resolved successfully without invading the statutory prerogatives of the Department. The statutory mandate to the Board is not to maximize revenue or to punish nettlesome taxpayers, but to assure the equality of taxation and fairly adjudicate disputes brought before it.

*Id.* at 674.

[¶ 23] Counties must also bow to the valuation authority of the Department. While the legislature undoubtedly is aware of the pecuniary interest of the counties in property valuation, the legislature has made the policy decision to assign to the Department the exclusive function to value property, subject only to review as directed by the legislature. As explained above, the legislature has limited the involvement of counties in the valuation process. This provides for a streamlined process wherein the Department is responsible for representing the interests of all state entities.

[¶ 24] While we understand counties at times may seriously question the valuation decisions of the Department, counties are but political subdivisions of the state. As such, when a county advances a position contrary to the position of the Department, theoretically the county is taking a position against itself. Bringing such infighting before the courts is not lightly allowed:

> A county is a political or civil division of the state, created to aid in the administration of government.

> "A county is but an agency or arm of the state government, created, organized, and existing for civil and political purposes, particularly for the purpose of administering locally the general powers and policies of the state, and as a matter of public convenience in the administration of the government. * * *" 20 C.J.S. Counties § 1, pp. 754–755.

> "The County is a political subdivision of the State whose creation and whose powers and duties are derived from the constitution and statutory law. * * *" *Cottonwood City Electors v. Salt Lake County Board of Commissioners,* 28 Utah 2d 121, 499 P.2d 270, 271 (1972).

See 56 Am.Jur.2d Municipal Corporations, Counties and Other Political Subdivisions, § 5, p. 74; and *Bondurant v. Board of Trustees of Memorial Hospital of Converse County,* Wyo., 354 P.2d 219, 221 (1960).

Accordingly, the County cannot sue the State, its creator, in the absence of a specific constitutional or statutory provision authorizing such an action. See *Board of County Commissioners of County of Otero v. State Board of Social Services,* 186 Colo. 435, 528 P.2d 244 (1974); *Board of County Commissioners of County of Dolores v. Love,* 172 Colo. 121, 470 P.2d 861 (1970); and *Salt Lake County v. Liquor Control Commission,* 11 Utah 2d 235, 357 P.2d 488 (1960).

"As its mere agent, * * * a county may not sue the state. * * *" 20 C.J.S. Counties § 320, p. 1283, citing *Albany County v. Hooker,* 204 N.Y. 1, 97 N.E. 403 (1912).

See *Athanson v. Grasso,* 411 F.Supp. 1153 (D.C.Conn.1976). Counties are not sovereign entities. They do not comprise a federation within the state. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, reh. denied 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964). They are part of the state itself. One cannot sue himself. Proceedings in our courts contemplate an adversary situation upon which they are based.

* * * *

Since one cannot have a position adverse to his own position, one cannot bring an action against himself. The County being a division of the State, it cannot sue the State.

*State v. Bd. of Cty. Comm'rs of Johnson Cty.,* 642 P.2d 456, 457–58 (Wyo.1982). Limitations on the authority of a county to bring a judicial action against the state reflect an appropriate separation of powers. A court is not necessarily the most appropriate forum for the resolution of intrabranch and intraagency policy disputes, and neither is the Board acting in its quasi-judicial function of adjudicating contested cases. Any specific arguments the counties may have regarding valuation should be directly addressed to the Department.[4] If the counties are not satisfied with their current level of interaction with the Department or with the representation they are receiving from the Department, their complaints are more appropriately directed to the legislature.

[¶ 25] In sum, under the current statutory framework the legislature has authorized only a very limited role for counties in the valuation process. The legislature has made the policy decision that the Department is the state entity responsible for valuing property. Counties, as subdivisions of the state, must rely upon the Department to adequately protect their interests in valuing property. For our purposes, this means that counties do not meet the necessary criteria for intervention as of right in a contested case between a taxpayer and the Department. In fact, the clear conclusion from the foregoing analysis is that counties simply cannot challenge, through participation in a contested case in any capacity, the valuation methodology or the application of that methodology, including definitions as determined by the Department of the components of a valuation equation. Uinta County should not have been allowed to intervene as of right and certainly should not have been allowed to bring the issue of the definition of direct costs of production.

[¶ 26] The Department, in its brief, presents no argument as to the propriety of the intervention by Uinta County into the administrative case. Instead, the Department argues that this Court should review the merits of the issue presented by Uinta County in the name of judicial economy. The Department informs this Court that it has accepted the ruling of the Board on this issue and has informed all affected taxpayers to include production taxes and royalties as direct production costs. The taxpayers, predictably, have appealed the Department's decision. The Department argues that, since this Court will have to decide the issue at some point, it might as well do so now. This argument, however, ignores the procedural posture of this case. We have already held

4. As an example of one method of handling interagency disputes without resort to any judicial process, there was testimony in the underlying contested case hearing that the DOA and the Department operate under a Memorandum of Understanding that provides for how a dispute between the two Departments will be handled. The testimony was that any disagreement would work its way up through both Departments and ultimately go to the governor if necessary.

that Uinta County had no authority to intervene. We have also held that Uinta County cannot legally challenge the initial decision by the Department on this issue. Thus, this issue has no place in this particular proceeding at this stage. Judicial economy cannot be invoked as a pretext for this Court to issue an advisory opinion. We decline to review the issue on the merits.[5] The contested case should have proceeded without the intervention of Uinta County or a review of the issue brought by Uinta County. Uinta County is dismissed from this appeal. Upon remand, Uinta County, as well as the issue it presented, must be dismissed from the action.

[¶ 27] The improper intervention of Uinta County does not taint, however, the entire proceedings. Improper intervention generally does not affect jurisdiction. *See* W.R.C.P. 21. The contested case hearing was conducted in distinct phases. In the first phase, Uinta·County bore the burden of presenting its case with regards to its proposed definition of direct costs under the proportionate profits method. After evidence was presented on this issue, the contested case switched to the next phase in which Amoco bore the burden on its issues. Uinta County was allowed to participate in this phase. Uinta County questioned the witnesses called by Amoco and the Department but did not call any witnesses of its own. Under the facts of this case we will accept the decision of the Board on the remaining issues and will continue with our review thereof.

### Point of Valuation

[¶ 28] For context, in its most simplified form, under the proportionate profits method of valuation, any increase in direct production costs increases tax liability. Any de-

crease in direct processing or direct transportation costs increases tax liability. The second and third issues raised by Amoco challenge decisions by the DOA and the Department to recategorize certain expenses, increasing Amoco's tax liability.

[¶ 29] With regard to the point of valuation, Wyo. Stat. Ann. § 39–2–208(b) (Michie 1997), recodified as § 39–14–203(b) (Lexis-Nexis 2003), defines the point of valuation for gas:

(ii) The fair market value for crude oil, lease condensate and natural gas shall be determined after the production process is completed. Notwithstanding paragraph (x) of this subsection, expenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the mineral;

* * * *

(iv) The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first.

The parties to this case agree that no dehydration occurs in the field, so the point of valuation is either the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever comes first.

[¶ 30] The physical layout of Whitney Canyon is not disputed. In paragraph 64 of its decision, the Board found:

5. Uinta County also argues that this Court should decide the merits of the issue in the name of judicial economy. It argues that it will bring the issue in its appeal of the final valuation notice in this case. Our holding that Uinta County cannot appeal this issue forecloses any further discussion on the issue. In its final order, the Board suggested that judicial economy is served because Uinta County could request a review of the decision of the Department pursuant to § 39–11–102.1(c)(x) which requires the Board to "carefully examine into all cases

wherein it is alleged that property subject to taxation" has been improperly assessed "or the law in any manner evaded or violated." This appeal presents no occasion for this Court to determine whether this conclusion by the Board is correct. We only note the obvious—an examination under subsection (x) is a completely different proceeding than a contested case under subsection (a). The principle of judicial economy does not justify completely ignoring statutorily based procedural requirements. Again, we decline to issue an advisory opinion.

After extraction from the well, [Amoco's] gas passed through a well location meter, was heated to prevent the formation of hydrates and placed in the gathering system at a plant process control valve. The gathering system collected the production from the wells served by the Whitney Canyon plant and transported the gas to a compressor station and then to the inlet to [Amoco's] Whitney Canyon plant.

The first meter, described by the Board as a well location meter, is a volume control meter. It measures the volume of gas being produced. After the gas has passed through the volume control meter and is heated, it passes through control valves that are exclusively controlled by the plant operators. The purpose of these valves is to control the amount of hydrogen sulfide entering the system. By use of the control valves, the plant operator can mix the different gas streams in any combination that is most efficient for plant production. Beyond the control valves is a transportation related compressor and then the processing facility. Title to the gas remains with Amoco until sold at the tailgate of the plant.

[¶ 31] For statutory purposes, then, the compressor comes before the plant so the inlet to the compressor would be the point of valuation unless there is a "custody transfer meter" before the compressor. This, of course, is where the battle is joined. Amoco claims the volume meters at the wellheads legally constitute "custody transfer meters" as required by statute. The DOA and the Department, however, determined that custody did not transfer until the product was sold at the tailgate of the plant and thus the volume meters at the wellheads were not custody transfer meters. The Board determined that Amoco did not present adequate proof that the volume meters at the wellhead were custody transfer meters as contemplated under the statute.

[¶ 32] Amoco's proof at hearing consisted primarily of testimony from its production tax audit coordinator, Mr. Bill Warren:

Q: Talk to me about the gathering lines a little bit. You said that it's Amoco's position that processing starts right at the wellhead; is that right?

A: The point of valuation being the wellhead meter, the meter at the inlet of the inlet line—or the gas collection line.

Q: What kind of meter is that at the wellhead?

A: It's not a sales meter as such.

Q: Is it a custody transfer meter?

A: In theory, for state tax purposes, it's a custody transfer meter. In theory only, for the simple reason that the products that's going through that meter are unprocessed.

Q: Are the products being sold when they go through that meter at that point?

A: The products are sold at the tailgate of the Whitney Canyon Plant, but the value of those products and the volume of those products are driven right back down that inlet line right to that point of valuation.

Q: Would you agree with me that the meters at the wellhead are class A check meters?

A: I've heard the term class A, and I'd say that that's probably a true statement. It would take an engineer to confirm that, but based on what I know about a class A meter, I'd say that's true.

Q: And would you agree with me that class A meter is not the same thing as a custody transfer meter?

A: Again, I would say that a custody transfer meter in a normal sense is not that same kind of meter that—again, if you use the word "custody transfer meter" for this particular meter, you're talking about for severance purposes. You're not talking about—you're talking about severance purposes, but realizing that there is a specific meter at the tailgate of the plant that's used for selling NGLs and gas, not the same meter.

Q: They are not the same meter?

A: No.

* * * *

Q: Earlier you testified that a class A check meter is different than a custody meter, correct?

A: I would say that it could be different. Again, I am not a meter expert and it

would take an engineer to be a meter expert. But normally LACT meters, and I forgot the word I'm looking for, a LACT meter applies to oil, and a LACT meter is definitely a different meter than a so-called class A meter as far as I'm concerned.

And also when you're talking about gas measurement, there are all kinds of new-type gas measurement meters that are available now and I don't think that they fit into the term "class A meter." The class A meter to me is a meter that's used in a field to measure volume, and that volume is used at a later point in time for allocation purposes. That's what I would normally think of as a class A meter.

Mr. Paul Syring, a senior tax representative for Amoco based in Denver, also testified that the volume meters at the wellheads are custody transfer meters. Finally, Amoco admitted into evidence a Processing Agreement between the producers and the processor that, on appeal, Amoco claims provides for the legal transfer of custody from the producer to the processor at the inlet to the gas transportation system.

[¶ 33] The Board rejected Amoco's evidence. The Board specifically held:

We reject [Amoco's] contention that the volume meters located at or near the wellhead and prior to the inlet to the gathering system are custody transfer meters as that term is used in Wyoming Statute 39–2–208(b)(ii) [recodified as § 39–14–203(b)(iv)]. The only testimony even remotely identifying the volume meters as custody transfer meters came from Mr. Warren. He said only that they were custody transfer meters "[i]n theory only, for purposes of taxation." We find that testimony unpersuasive. We do not believe the legislature contemplated the use of a theoretical custody transfer meter as the point of valuation for taxation purposes.

We conclude that the custody transfer contemplated by that section is the transfer of custody from the producer to the purchaser. This interpretation is consistent with the definition of "lease automatic custody transfer meter" used by the legislature for crude oil valuation requiring a transfer from a producer to purchaser.

*Wyoming Statute 39–2–208(m)(v)* [recodified as § 39–14–203(b)(iii)]. In this case transfer from producer to purchaser occurs at the tailgate of the processing plant, not at the beginning of the gathering system.

(Emphasis in original). Since Amoco did not prove that the volume meters at the wellhead were custody transfer meters, the Board affirmed the Department's decision that the point of valuation is the inlet to the compressor.

[¶ 34] Amoco repeats its arguments in this appeal. Amoco adds that the Board was incorrect when it determined that a custody transfer was limited to a transfer between a producer and a purchaser. "Custody transfer meter" is not defined by either statute or rule. Neither party suggests that a custody transfer meter is a term of art specific to the gas industry. Instead, the parties argue that the term should be defined based upon the plain meaning of the words. The parties are correct. Statutory construction involves a question of law and as such the review of this Court is de novo. Our primary consideration in construing statutes is to determine the intent of the legislature. We begin by construing the statutory language according to the ordinary and obvious meaning of the words at issue according to their arrangement and connection. *Loberg v. State,* 2004 WY 48, ¶ 5, 88 P.3d 1045, ¶ 5 (Wyo.2004).

[¶ 35] "Custody" is defined as "immediate charge and control ... exercised by a person or an authority; *also:* safekeeping." Merriam–Webster's Collegiate Dictionary 285 (10th ed.2000). "Transfer" is defined as "to convey from one person, place, or situation to another: transport" or "to cause to pass from one to another: transmit" or "to make over the possession or control of: convey." *Id.* at 1249. "Meter" is defined as "one that measures; *esp:* an official measurer of commodities." *Id.* at 729. Construing the words in the context of valuing gas, a custody transfer meter is an official measurer of gas as it passes from one entity to another for the other's immediate charge or control.

[¶ 36] Applying this definition to the facts of this case, even the Department in its brief admits that the Board's conclusion that the transfer must be between the producer and a purchaser is incorrect. The statute does not require a change in title. Further, the Department placed a great deal of emphasis in its presentation on the fact that the meter selected by Amoco as a custody transfer meter is a volume meter and not what is normally considered a sales meter. While the physical characteristics of the meter designated as a custody transfer meter may have evidentiary value, the physical type of the meter is not definitive. Standing by itself, the type of meter does not determine whether custody is being transferred at the meter.

[¶ 37] While the analysis of the Board may be incorrect, Amoco still bears the burden of presenting credible evidence supporting its position that the volume meters at the wellheads are custody transfer meters. Amoco produced two employees who simply made a blanket statement that the volume meters at the wellheads were custody transfer meters for state tax purposes. Amoco then generically argued that a producer agreement provided for the transfer of custody of the gas at the inlet to the gathering system. Amoco does not provide any specific discussion regarding the agreement nor does it specify any particular provision in the producer agreement.[6] Under these facts, we hold that Amoco has not met its burden of presenting credible evidence that the volume meters at the wellhead are custody transfer meters. Thus, under the statute, the determination of the DOA and the Department that the point of valuation is at the inlet to the compressor is affirmed.[7]

---

6. Amoco initially referred this Court to 324 pages of the record when it presented its argument regarding the producer agreement in its brief.

7. Amoco also argued that the issue of when production ceases, and thus the location of the point of valuation, was decided in *Chevron v. State,* 918 P.2d 980 (Wyo.1996), and cannot be revisited pursuant to the doctrines of collateral estoppel and res judicata. We reject this argument because the analysis in *Chevron* discussing production and the point of valuation was grounded

*Processing Expenses*

[¶ 38] Upon audit, the DOA disallowed several expense sub-accounts that Amoco had included as direct costs of producing. Amoco personnel stamp invoices with account and sub-account numbers. Account number 9272 is the processing expense account for Amoco's Evanston District. Amoco's Evanston District not only includes the Whitney Canyon fields and plant, but also the Painter fields, the Painter Gas plant, the Ryckman Creek fields, the Clear Creek fields, the East Painter fields, the Anschutz plant and the Anschutz fields. The sub-account numbers distinguish various types of expenses. For instance, sub-account number 9272–10 is a sub-account for truck and service equipment expenses. Sub-account 9272–11 includes automobile expenses. There are also location identifiers on the invoices, also supplied by Amoco personnel. The auditor for the DOA, Mr. Derek Weekly, testified that he understood Amoco's accounting and coding system.

[¶ 39] Amoco presents several challenges to the audit methods. First, Amoco challenges the independence of the auditor. Mr. Weekly consulted with Ellwood Soderlind for certain parts of the audit. Mr. Soderlind was the DOA auditor who was responsible for an audit of Whitney Canyon for production years 1983 through 1988. Production during those years was valued according to the netback method. Production for the year 1989, a year included in Mr. Weekly's audit, was also valued according to the netback method. For the sake of consistency, Mr. Weekly was told to deny any expenses that he found that were the same as expenses that Mr. Soderlind denied in his audit for the prior production years. The testimony is clear, however, that Mr. Weekly only coordinated with Mr. Soderlind regarding expenses

upon a statutory definition read in pari materia with other statutes. The legislature changed the core statute at issue in *Chevron* in 1990. The 1990 version of the statute is applicable to the instant facts. Thus the *Chevron* discussion regarding point of valuation and production has been superseded by statute. The same applies to any decision made by the Board regarding the point of valuation for Whitney Canyon for prior production years under the netback method of valuation.

for production year 1989. Because of the change in valuation method to the proportionate profits method, Mr. Weekly used his own judgment for all expenses for production years 1990 through 1992. Since only production years 1990 through 1992 are at issue in this appeal, we need not decide if the coordination between Mr. Weekly and Mr. Soderlind for production year 1989 presents a problem regarding the independence of audit decisions.

[¶ 40] Amoco's next complaint regards the process the auditor used to determine if an expense was allowable as a direct processing expense. The auditor testified that he used a three-step process in analyzing receipts. First, the auditor looked at the expense to see if he could relate it directly back to the Whitney Canyon plant. The auditor testified that many expenses could only be traced to the Evanston District and could not be related directly back to the Whitney Canyon plant. These expenses were denied. The auditor also checked the nature of the expense to verify if it was something that could be directly utilized by Whitney Canyon. For instance, the auditor found an invoice for nitrogen that was allocated to Whitney Canyon but delivered to Painter field. The auditor knew that nitrogen was regularly used at Painter field but was unaware of any substantial use for nitrogen at Whitney Canyon. The auditor thus disallowed the expense even though the invoice was stamped with a Whitney Canyon plant allocation.

[¶ 41] The second step was to determine if the expense was allowable as a processing or transportation expense by statute or rule. The third step was to determine if the expense was directly related to processing the gas stream at the Whitney Canyon plant. Mr. Weekly provided the following example of how the process worked:

> The 9272, sub-account 1 was charges from other company operations. And what we found was allocations to overhead, whether it was to the plant in Wyoming, the Evanston District was one part of these overhead breakout. There was also plants out of the state of Wyoming. It was different areas out of the state of Wyo-

ming. It was just basically trying to pinpoint where these expenses occurred.

> What I found were expenses that were charged to the Evanston District. The Evanston District, and I think I testified to it yesterday, can include a vast array of things. You have the Whitney Canyon Gas Plant, the Painter Gas Plant, the Anschutz Gas Plant, plus you have all the fields, you have the Painter fields, Ryckman Creek fields, the Clear Creek fields, Anschutz fields, Whitney Canyon fields, Carter Creek fields and then you have the offices in Evanston alone. So I couldn't pinpoint that directly back to Whitney Canyon.

> There were breakouts that would actually take the Evanston District, they numbered it like 80, 81, 83, something like that, that you can tie back to Whitney Canyon, but I still could not tell what that labor was doing. Was it directly related to the processing of gas?

> If you look at the definition in the Board rules under what's allowable under the processing, it specifically states, "Labor whose primary purpose is processing a gas stream." And then it goes further on in that. And so I had to look at it in my threefold system. Number one, I felt I couldn't tie it right back to the Whitney Canyon Gas Plant. I can tie it back to Whitney Canyon because there's a statement in there that said Whitney Canyon; however, that can mean field, it can mean sulfur haul road, sulfur loadout terminal, the wells themselves. I couldn't tie it right back to the plant. So I felt at that point really that I said no to my first point.

> My second point, whether I can fit it into the statutes or rules, again, it was labor directly related whose primary purpose is processing that gas stream. I couldn't tell where that labor was occurring, so I said no on that point that I could not tie it into labor that was directly responsible for processing that gas stream.

> On the third point, is it a direct expense, and I had to say no on that because that labor that is, you know, just kind of overhead labor that can be distinguished out elsewhere is considered an indirect over-

head, in my opinion, so I said no to all three categories, so therefore I disallowed sub-account 1.

Mr. Weekly was able to give similarly specific testimony with regards to each sub-account he disallowed.

[¶ 42] Amoco takes particular issue with the third step in Mr. Weekly's analysis. Amoco contends that expenses do not have to be directly related to the processing of the gas stream to qualify as a production or transportation expense. Amoco complains that the legislature could not possibly have intended expenses such as the land lease for the plant and environmental permits be disallowed as processing expenses. However, such expenses are not direct costs of gas processing. The intent of the legislature must be determined based upon the plain language of the statute. Wyoming Statute § 39–2–208(d)(iv), recodified as § 39–14–203(b)(vi) (LexisNexis 2003) states:

(D) Proportionate profits—The fair market value is:

(I) The total amount received from the sale of the minerals minus exempt royalties, nonexempt royalties and production taxes times the quotient of the direct cost of producing the minerals divided by the direct cost of producing, processing and transporting the minerals; plus

(II) Nonexempt royalties and production taxes.

The statute, in very plain and direct terms, clearly requires the use of direct costs in the quotient. Mr. Weekly's analysis is supported by statute.

[¶ 43] Amoco argues that its books and records are kept in accordance with generally accepted accounting principles. Its business records are created and kept in the usual and ordinary course of business and must be presumed credible. Thus, Amoco argues that the auditor acted arbitrarily and capriciously in attempting to independently verify the invoices.[8] Amoco's argument inappropriately shifts the burden of proof. The valuation of the Department is presumed val-

id. The officials charged with establishing value are presumed to have exercised honest judgment in accordance with applicable statutes, rules, and regulations. It is Amoco's burden to present credible evidence rebutting these presumptions. At the hearing, Amoco presented testimony from Mr. Warren that further documentation is and always has been available and had Mr. Weekly only asked, Mr. Warren would have produced any further documentation Mr. Weekly required to satisfy his three-step process. Unfortunately, Mr. Warren's offer came too late. Even at the hearing no documentation was introduced on any disallowed expense that provided the specific information that Mr. Weekly testified he needed to allow the expense. Amoco simply failed in its burden of proof.

[¶ 44] Amoco also presents several challenges to the audit as a whole. First, Amoco claims the audit was inconsistent because the auditor only audited processing accounts. The auditor never audited production accounts. Any disallowance of a production expense would have lowered Amoco's tax liability. Amoco argues that the audit was not fair because its only purpose was to increase Amoco's tax liability, with no attempt being made to conduct a thorough, consistent audit. Amoco, however, cites to no authority to support its proposition that the audit was unfair and makes no argument that it was prejudiced by the failure of the auditor to audit production accounts. This Court does not consider arguments not supported by cogent argument or pertinent authority. *Dobson v. Stahla*, 2003 WY 6N, 63 P.3d 209 (Wyo.2003).

[¶ 45] Amoco next cites to several instances in the record where it alleges inconsistencies in the testimony of Mr. Weekly. This presents an issue of credibility. Credibility is properly assessed by the Board, as the body with the duty to weigh the evidence and determine the credibility of the witnesses. *Gilmore v. Oil & Gas Conservation Comm'n*, 642 P.2d 773, 776 (Wyo.1982) ("we may not substitute our opinion as to the

---

8. This seems perhaps an ironic charge given that Amoco's first complaint regarded its perceived

lack of independence of the auditor.

weight and credibility of the evidence for that of the Wyoming Oil and Gas Conservation Commission"). Ultimately this argument comes down to a challenge on the sufficiency of the evidence. Without going into further detail, it is clear from the Board's decision that the Board found the testimony of Mr. Weekly to be credible and determined that substantial evidence existed to support his decisions. Upon reviewing the entire record, this Court finds the decision by the Board on this issue to be supported by substantial evidence.

[¶ 46] Amoco also complains about the sampling method used by the auditor. The auditor disallowed sub-accounts in full based upon a sampling of expenses within the sub-accounts. If the majority of expenses sampled in a sub-account were disallowed, the auditor disallowed the entire sub-account. Amoco argues that a ratio of disallowed expenses to allowed expenses should have been established for each sub-account. This error ratio then should have been projected onto the total expenses in the sub-account to determine the amount disallowed. In other words, if a sampling showed 60% of expenses sampled were not allowable, then 60% of the entire account should be disallowed, with the remainder of the account being allowed.

[¶ 47] Amoco bases its argument on DOA rule Chapter 11, § 14:

Examination of Records.

(a) Auditors may use sampling methods which are approved under generally accepted auditing standards to test the audited entity's accounting system and records. Based upon the results of the tests, the auditors, in consultation with the audit supervisor, shall determine whether to continue or terminate the audit.

(b) If the test results show that the audit should be continued, the auditors may conduct the audit by the use of approved sampling methods. If the auditors elect to use a sample projection, the audited entity will be informed and the sampling method used will be explained. Sampling means that a valid portion or percentage of accounts, invoices, purchase or sale documents, or other records representative of the time frame being audited, will be examined and the results will be projected for the total population from which the sample is drawn.

Department of Audit's General Auditing Rules and Procedures, ch. 11, § 14 (Nov. 30, 1992). Amoco does not, however, provide specific argument as to the meaning and application of this rule.

[¶ 48] This rule only requires that the results of the sampling be projected for the total population of the sub-account being sampled. The rule does not address what should happen to the sub-account once the results of the sampling are projected. Amoco argues that the sub-account should be allowed, with only a ratio of expenses disallowed. The auditor, however, determined that the results of the sampling would be to determine if the sub-account as a whole would be allowable or not. Thus, if his sampling revealed some non-allowable expenses, but the sampling as a whole revealed the expenses were allowable, the auditor projected that result to the sub-account and allowed the entire sub-account. If his sampling showed that the sample population was non-allowable, he projected that determination to the entire sub-account and disallowed the entire sub-account.

[¶ 49] Neither the result suggested by Amoco nor the result applied by the auditor violates the DOA rule. The rule simply is not applicable to the issue. The auditor specifically testified that throwing out entire sub-accounts based upon a finding that the sample population for that sub-account was not allowable was a common practice in the industry. Amoco presents no argument to the contrary. In general, Amoco has not met its burden of proof that any of the actions of the auditor were arbitrary, capricious, constituted an abuse of discretion or are unsupported by substantial evidence. The decision of the Board regarding the audit expenses is affirmed.

### Penalties

[¶ 50] As an initial note, Amoco was not penalized for the extra taxable value associated with the addition of royalties and

production taxes as direct costs of producing. The Board determined that its decision on that issue could not have been foreseen and so penalties were not warranted. Amoco was assessed penalties for the extra taxable value associated with the recategorization of the gathering lines from a processing expense to a production expense and the disallowance of several claimed processing expenses.

[¶ 51] On appeal, Amoco contends that it should not be subject to penalties because it fully reported all of its volumes and the actual proceeds it received. The difference in the taxable value is a result of reasonable differences of opinion regarding the categorization of some of the expenses. Amoco reported in good faith and had no reason to know or even guess that its categorization of these expenses would be rejected. Amoco's argument continues that, since it voluntarily complied with all requirements of self-reporting, it should not be penalized.

[¶ 52] Whatever may be the merits of Amoco's argument on appeal, Amoco did not present this argument to the Board. In fact, the only argument presented by Amoco at the contested case hearing was in its written closing in which it claimed that the Department had not introduced any evidence supporting the imposition of penalties. Amoco argued that penalties are not supported absent evidence of non-compliance or negligence. The Board did not accept this attempt at switching the burden of proof. Amoco did not even mention penalties in its motion for reconsideration.

[¶ 53] This Court does not review issues that were not properly developed below.

We have stated that " '[w]e strongly adhere to the rule forbidding us to "consider for the first time on appeal issues that were neither raised in, nor argued to, the trial court," except for those issues which are jurisdictional or are fundamental in nature.' " *Hronek v. St. Joseph's Children's Home*, 866 P.2d 1305, 1309 (Wyo. 1994) (quoting *Bredthauer v. TSP*, 864 P.2d 442, 446–47 (Wyo.1993) and *Oatts v.*

*Jorgenson*, 821 P.2d 108, 111 (Wyo.1991)). " 'We follow this rule because "it is unfair to reverse a ruling of a trial court for reasons that were not presented to it, whether it be legal theories or issues never formally raised in the pleadings nor argued to the trial court." ' " *Hronek*, 866 P.2d at 1309 (quoting *Bredthauer*, 864 P.2d at 446–47 and *Oatts*, 821 P.2d at 111); *see also* 5 Am.Jur.2d *Appellate Review* § 690 (1995). "We of course must not judge the matter of abuse of discretion on the basis of showings made to us on appeal. We must judge on the basis of showings made to the trial court. . . ." *Holly Sugar Corp. v. Perez*, 508 P.2d 595, 599 (Wyo.1973). We have articulated and followed this principle on numerous occasions. *See Rock Springs Land and Timber, Inc. v. Lore*, 2003 WY 100, ¶ 35, 75 P.3d 614, 627 (Wyo.2003); *State v. Campbell County School Dist.*, 2001 WY 90, ¶ 35, 32 P.3d 325, 333 (Wyo. 2001); *Daley v. Wenzel*, 2001 WY 80, ¶ 19, 30 P.3d 547, 552–53 (Wyo.2001); *Robinson v. Pacificorp*, 10 P.3d 1133, 1136 (Wyo. 2000); *Cooper v. Town of Pinedale*, 1 P.3d 1197, 1208 (Wyo.2000); *WW Enterprises, Inc. v. City of Cheyenne*, 956 P.2d 353, 356 (Wyo.1998); *Squaw Mountain Cattle Co. v. Bowen*, 804 P.2d 1292, 1296 (Wyo.1991); *Epple v. Clark*, 804 P.2d 678, 681 (Wyo. 1991); *Esponda v. Esponda*, 796 P.2d 799, 802 (Wyo.1990); *R.O. Corp. v. John H. Bell Iron Mountain Ranch Co.*, 781 P.2d 910, 913 (Wyo.1989); *U.S. Aviation, Inc. v. Wyoming Avionics, Inc.*, 664 P.2d 121, 125 (Wyo.1983); *Roush v. Roush*, 589 P.2d 841, 844 (Wyo.1979); *Thickman v. Schunk*, 391 P.2d 939, 943 (Wyo.1964); *Gore v. John*, 61 Wyo. 246, 157 P.2d 552, 556 (1945); and *Ideal Bakery v. Schryver*, 43 Wyo. 108, 299 P. 284, 293 (1931).

*Yates v. Yates*, 2003 WY 161, ¶ 13, 81 P.3d 184 (Wyo.2003). Amoco does not contend that this issue is either jurisdictional or fundamental. This Court does not consider the imposition of penalties under the circumstances of this case to be so fundamental as to require our review when Amoco failed to present its current argument against the imposition of such penalties before the Board.[9]

---

9. In its reply brief, Amoco raises yet another

objection to the ruling of the Board regarding

## CONCLUSION

[¶ 54] This action began as a contested case brought by Amoco against the Department. Uinta County should not have been allowed to intervene in the contested case. Uinta County is dismissed from this appeal. Upon remand, the Board must dismiss Uinta County as a party and the issue it raised. The Board's decision on the issue raised by Uinta County is vacated. The result of this is to reinstate the initial determination of the Department that production taxes and royalties should not be included as a direct cost of production in the proportionate profits equation.

[¶ 55] All audit issues are affirmed. Valuation by the Department is presumed accurate. Amoco did not present sufficient credible evidence to overcome this presumption. Amoco's issue concerning the imposition of penalties is not properly before this Court and as such the imposition of penalties is summarily affirmed. The case is remanded for further proceedings consistent with this opinion.

imposition of penalties. Amoco argues that the Department's determination of penalties violated the decision of this Court in *Amoco Production Co. v. Wyoming State Bd. of Equalization*, 12 P.3d 668 (Wyo.2000), that requires the Department to determine the net tax deficiency of Amoco across the state before imposing a penalty. Again, this issue is not properly before this Court and is not so fundamental as to relieve counsel of its obligation to present its arguments according to established procedure.